Battle, J.
 

 The object of the hill is to convert the defendant into a trustee for the plaintiffs, of a certain slave, named George, upon the allegation that his intestate purchased him with the money of, and for Lawrence Clement, under whom they claim, while he took the conveyance to himself. The allegation that his intestate purchased for Lawrence Clement, or with his money, is expressly denied in the answer. On the contrary, the defendant avers that his intestate purchased the slave for himself; took the bill of sale to himself, paid for him with his own money, and took and kept possession of him—
 
 *185
 
 using and claiming him as Ms own until his death. A replication to the answer was filed, and the parties proceeded to take proofs; and the question presented for our consideration is, whether the plaintiffs have sustained their allegations by that kind and amount of testimony which a Court of Equity, in such cases, requires. It has long been settled both in England and in this State, that if one person buys an estate for another, with the money of the latter, a trust results for him; and that such trust may be proved by parol evidence. Gay v. Hunt, 1 Murph. 141 — Henderson v. Hoke, 1 Dev. and Bat. Eq. 119. Hargrave v. King, 5 Ired. Eq. 430, Adams Equity 144 — Hill on Trustees, 95. But where the evidence is merely parol, it will be received with great caution, and the Court will look anxiously for some corroborating circumstances in support of it; and in cases of this nature, the claimant in opposition to the legal title, should not delay the assertion of his right, as a stale claim would meet with but little attention. Hill on Trustees 96, 2 Sug. Ven and Purch, ch. 15, sec. 2, (page 152 of 9 Ed.) Tench v. Tench 10 Ves. 517— Wilkins v. Stephens, 1 You. and Col. N. C. 431, Adams Eq. 144. The case before us is very much like that of a bill seeking to correct a deed absolute on its face, and to hold it as a mortgage or other security for a debt. “To do this, (as this Court has several times held,) it must be alleged and of course proved, that the clause of redemption was omitted by reason of ignorance, mistake, fraud or undue advantage; and the intention must be established, not merely by proof of declarations, but by proof of facts and circumstances
 
 dehm's the deed
 
 inconsistent with the* idea of an absolute purchase.” Kelly v. Bryan, 6 Ired. Eq. 283 — Sowell v. Barrett, Busb. Eq. 50 —Brown v. Carson, Ibid. 272. In both classes of cases, the object of a Court of Equity is the same — that is to convert a deed, absolute in terms, into a deed in trust or a mortgage, or some other security for money; arid to do this by the aid of parol testimony. It is in effect to make titles to property,
 
 *186
 
 which ought to he evidenced by solemn instruments in writing — to depend under certain circumstances, in some degree, on the “slippery memory of witnesses.” The Court would be faithless to the high trust confided to it, did it not, in such cases, proceed with great caution, and require something more than proof of the party’s declarations to take from him his estate in whole or in part. Such testimony is, (as that eminent Judge,
 
 Sir William Grcmt,
 
 has said:) “in all cases most unsatisfactory, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Resides, the slightest mistake or failure of recollection may totally alter the effect of the declaration.” Hence the rule that in addition to the proof of declarations, there must be proof of facts and circumstances
 
 dehors the deed
 
 inconsistent with the idea of an absolute purchase by the party for himself.
 

 Having ascertained the kind and amount of testimony which the Court requires, we are prepared to proceed to an examination of the proofs, to see whether upon them the plaintiffs are entitled to the relief which they seek. It is admitted that George the slave in controversy, was purchased by John Clement, the defendant’s intestate, at a sale made by Giles "W. Pearson, Esq., as trustee, on the 28th June, 1828, and that an absolute bill of sale was executed to the purchaser on the same day. The price bid was one hundred and forty-three dollars, of which sum $26,06 was paid to the trustee, and a note for the residue $116,94 was given by the purchaser to A. G. Carter, Esq., who was a trastee of all the remainder of the debtor’s property for the benefit of John Clement and Lawrence Clement, who were respectively guardians of certain minors. The note expressed on its face, that it was the excess of the sale of John Hail’s (the debtor,) property, and was made payable to Carter as “trustee for the use of John Clement and others.” The deed to Carter does not specify the debts which itais intended to secure, otherwise than by a general description of “sundry bonds to the amount of $1315
 
 *187
 
 or tliere about, part new due and owing, and a small balance owing and payable at a future day, asset forth in said bonds.” Mor does it show how much was due to each of the creditors. It appears,'however, from the exhibits filed, that at least, seven hundred and twelve dollars were due to John Clement. Carter’s sale was made the 7th day of August 1828, John and Lawrence Clement, both being present, and buying nearly all the property. Erom the original account of the sale, which is on file as an exhibit, it appears that the purchases made by John Clement amounted to about $840, and those by Lawrence to only about $40; the whole amount, including purchases made by ethers, being about $900. If to this be added the amount of the note given by John Clement, as the excess of Pearson’s sale, the whole fund in the hands of Carter, applicable to the payment of the debts secured in the deed to him, was about $1016. This fund, as is manifest without adverting to the statement to that effect by Carter, was insufficient for the payment of the debts, and they had to be scaled. The settlement between Carter and the creditors was madejas testified by Carter, in the presence of both, and John’s note was included in it; but whether it was paid out of John’s or Lawrence’s money, the witness did not know. In calculating the interest on the bonds and'making the estimates necessary for
 
 tlie pro rata
 
 deduction
 
 to be
 
 made on the debts, Carter was assisted by John Clement, who was a man of business, and the figures made by them in pencil appear on the back of the account of sale, and John’s note. Carter afterwards executed to John Clement a bill of sale for the slaves Betty and Minerva, purchased by him at the sale. Lawrence Clement, though present, at the settlement, did not assist in making it. He was then, as deposed to by Carter, a man feeble and afflicted, but of a good mind, and understood how to manage his money matters as well as any body; and though not good at figures, it was hard for any person to take advantage of him. John, who was his nephew, had been his
 
 *188
 
 agent in the transaction of some of his business, but whether he was so in making the settlement with Carter, the latter did not know, and it does not appear from the testimony of any other person. The proofs, thus far, certainly do not sustain the allegations of the plaintiffs, that John Clement purchased George as agent for Lawrence,' and paid for him out of the latter’s money. On the contrary, they show that he bid off the slave at Pearson’s sale, apparently for himself, took the hill of sale to himself, and in payment for the greater part of the price gave his note to Carter, and afterwards accounted for it in a settlement with him. It is true that his purchases at Carter’s sale amounted to three, or four hundred dollars more than the debts which he as guardian had secured in the trust, and that surplus was to be paid to Lawrence by the trustee. It is possible that an arrangement may have been made between John and his uncle Lawrence, by which the latter was to take George as a payment in part or in whole for that surplus; hut neither Mr. Carter nor any other person, so far as the testimony shows, ever heard of such an arrangement ; or that Lawrence, either then, or at any other time during his life, ever set up any claim to George. If then, what has been before referred to, were the only testimony in the case, we should feel ourselves bound to declare that the plaintiffs claim was entirely unsupported by proof.— Let us proceed now to examine whether this defect is supplied by the remaining testimony.
 

 John Glide,
 
 whose deposition was given in August, 1852, states that in the year 1841 or 1842, John Clement, on his return from his aunt’s, in Davidson county, stopped at his house one or two hours, and during that time, told him that, “ he bought the Hail negroes, and that he was doing business for his uncle Lara, and bought them, and paid for them with his uncle Lara’s money, and had the right made in his own name, but they did not know it.” The witness says that John Clement was a much older man than himself — was a public man
 
 *189
 
 and was in the habit of doing a great deal of private bnsiness for his neighbors. That he did not name any of the Nail ne-groes, and witness did not know them, and that he could not recollect how the conversation about the negroes commenced, or what gave rise to it. He says that he thought it strange, was much surprised, and it was impressed upon his memory by his thinking at the time, that it would be the occasion of a law suit.
 

 Radford
 
 Foster, who was examined a short time after the other witness, testified'that about ten years before, at Christmas or Iiireing time, John Clement offered to hire to him a negro boy named George, who had belonged to John Nail, whom, he said, his aunt had sent to him to be hired out for her, but the price being too high for witness, he did not take him; though he did hire, from John Clement, a girl, Minerva, who, he told him, belonged to his aunt. The witness said further, that after John Hail’s sale, ho had seen the boy George, at Lawrence Clement’s several times, but at what time, whether before or after Lawrence’s death, or upon what terms he was staying there, he did not know.
 

 The testimony of
 
 Orcmdison Roberts,
 
 who was examined in, 1850, is, that some time since the year 1885, the boy George was in the possession of Polly "Wilson, who was a sister, and one of the legatees of Lawrence Clement; that said boy was hired one year to John Wilson, and another to William Thomas, and afterwards went back into the possession of Polly Wilson, and witness had heard her request John Clement, •who was her nephew, to take George and hire him out, because he was so unruly that she could not manage him; and that witness, having on a certain occasion corrected him for misconduct, at the request of Polly Wilson, John Clement afterwards enquired of him how his aunt Polly’s George was behaving himself.
 

 John Nail, Junior,
 
 was examined for the defendant, in October, 1852, and in his deposition, states that after his uncle
 
 *190
 
 John. Nail’s sale, George went first, into the possession of John Clement, afterwards into that of his mother, Elizabeth Clement, and then went to Lawrence Clement’s, where he lived about a year, and then left him about three years before his, Lawrence’s death; that witness lived about half a mile from Lawrence’s, and was often there; that John Clement had a negro boy named Bold, who worked for several years for his aunts, in Davidson County, and that about the time that Bold was taken back from Davidson, George was sent over, but witness does not say by whom he was sent.
 

 L. R. Rose,
 
 whose deposition was taken at the same time, testili es that he knew that John Clement had George in his possession for several years, claiming him as his own; that h© sometimes hired him out, and took the notes for the hire, payable to himself!
 

 Joseph Daniel
 
 gave his deposition in September, 1850, in which, he states, that when he first knew George, he was living with John Clement’s mother, and then went to Lawrence Clement’s, and lived there from March until Christmas, when Lawrence sent him over into Davidson, with one of his sisters ; that George left about one year and seven months before the death of Lawrence; that witness was living with him at the time George went there; that he had been living there three years before, and contiuned there about two years and ten months afterwards; that Lawrence sent for George, from Mrs. Clement's, and while he had him in possession, exercised the same control over him, as he did over his other negroes. All the witnesses, who speak on the subject, testify that Lawrence Clement was capable of attending to his business, and did attend to it generally, until within a short time before his death. In reviewing the above testimony we find that three witnesses testify to declarations of the defendant’s intestate, which tend, with more or less force, to prove that he bought the slave in question for Lawrence Clement, and paid the price with his money. But it is clearly a case in which the
 
 *191
 
 Court cannot, consistently, with established principles, make a decree for plaintiffs, unless there be found in the testimony some corroborating circumstances inconsistent with the idea of an absolute purchase by the claimant for himself. The purchase was made, and the bill of sale taken in June 1828; Lawrence Clement died in 1834, leaving a will, in which he bequeathed his
 
 “
 
 negroes ” to his sisters, Mary Wilson and Catharine Eve and Margaret Clement; John Clement died in the year .1845, and this bill was filed the year afterwards, 1846. There was a period then, of six years, from the time of the purchase, to the death of Lawrence Clement, the alleged
 
 cestui qwi trust
 
 — of seventeen years, to the death of the purchaser, the alleged trustee, and eighteen years to the time when the bill was filed. The witnesses, who testify to the declarations of the purchaser, speak of conversations which occurred ten years before the time, when they deposed. If any case demands a support from circumstances in corroboration of the party’s declarations, surely this does. The plaintiffs contend that it has, in the proof, that the slave was taken possession of, by Lawrence Clement, in his life time; that he sent the boy to his sisters, in Davidson county, and they kept possession of him several years, before and after Lawrence’s death. This might satisfy the requisition of the law, were it not capable of explanation, and were it not actually rebutted by other testimony. There is no proof — certainly no direct proof — that Lawrence Clement, though he must have known, that his nephew John, had purchased George at the first sale of John Nail’s property, ever in words, set up any claim to him in his life time.
 

 According to Joseph. Daniel’s testimony, George did not go into Lawrence Clement’s possession until more than three years after he was purchased by John, and during that, time he was in the possession of John and his mother. In what capacity Lawrence took and kept George, (ten months according to one witness, and twelve according to another,) is not
 
 *192
 
 stated. Tie may liave taken, him, as an owner, and he may have taken him as a hirer; and the utmost that can he claimed for the plaintiffs, is, that from the circumstances, one is about as probably as the other. Lawrence sent the boy to his sisters, in Davidson county; but that was just at the time when Bold, another boy who undoubtedly belonged to John Clement, had been taken home, because his aunts coul<! not manage him. It is not pretended that Lawrence gave George to his sisters before his death, and the boy may have gone to them with John’s consent, or by his request to work for his aunts in the place of Bold. Such a supposition, is, at least, consistent with I he facts stated by Mr. Rose, that John after-wards had him in possession, claiming him, and hiring him out for his own use. Uor is it contradicted by what is said by Grandison Roberts, that he “heard Polly Wilson request John Clement, to take George and hire him out, because he was so unruly that she could not manage him.” She did not say, “hire him out for liarand it may have been that she wished his owner to take him again, as she had on a lormer occasion sent back his boy Bold for a similar reason. It is thus seen that every circumstance, relied on by the plaintiffs as corroborative of their claim, may receive a fair and probable explanation consistent with the idea of an absolute purchase of the slave in question by the defendant’s intestate.— It is seen further, that there are several other circumstances appearing upon the testimony of some of the witnesses, particularly upon that of Carter and Rose, which cannot bo reasonably explained upon any other hypothesis. The plaintiff’s case must rest then, at last, upon the proof only of the declarations of defendant’s intestate, deposed to by witnesses ten years at least after they were alleged to have been made.— This, as we have shown, is insufficient — and the bill must be dismissed with costs.
 

 PeR Curiam. Decree accordingly.